Sean **REYNOLDS**, Plaintiff,

v.

Steven **CAMBRA**, **Warden, et al., Defendant.**

No. **CV977048CBMAJW.**

United States District Court, C.D. California, Western Division.

Mar. 9, 2001.

---

Sean Reynolds, San Luis Obispo, CA, pro se.

William T Harter, Margaret E Maxwell, CAAG - Office of Attorney General of California, Los Angeles, CA, for Steven Cambra, Jr., Atty. Gen., State of Cal., respondents.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

MARSHALL, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the entire record in this action, the attached Report and Recommendation of Magistrate Judge ("Report"), and the objections thereto. Good cause appearing, the Court concurs with and adopts the findings of fact, conclusions of law, and recommendations contained in the Report after having made a *de novo* determination of the portions to which objections were directed.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

WISTRICH, United States Magistrate Judge.

### Background

On March 11, 1994, petitioner was convicted of two counts of robbery, one count of attempted robbery, and one count of assault with a deadly weapon. In addition, the jury found true allegations that peti-

tioner personally used a firearm in the commission of the assault and that a principal was armed with a firearm during the robberies and the attempted robbery. [Motion to Dismiss, Ex. A]. Petitioner admitted that the had suffered one prior serious felony conviction and another conviction for which he had served a prison term. [Motion to Dismiss, Ex. A]. On May 11, 1994, petitioner was sentenced to state prison for a term of 18 years and 6 months. [Motion to Dismiss, Ex. A].

Petitioner appealed to the California Court of Appeal, which affirmed petitioner's petitioner's conviction and sentence on February 7, 1995. [Motion to Dismiss, Exs. B & C]. Petitioner then filed a petition for review in the California Supreme Court. [Motion to Dismiss, Ex. D]. The petition was denied on January 3, 1996. [Motion to Dismiss, Ex. D].

■ Petitioner filed this petition on August 26, 1997.[1] The petition alleges that (1) petitioner was denied his right to have a jury decide the truth of the personal firearm use enhancement because the trial court failed to instruct the jury as to the elements of the enhancement and it was questionable whether petitioner's possession of the gun fell within the definition of the enhancement, and (2) petitioner was denied due process because the trial court did not instruct the jury on the lesser included offense of simple assault and exhibiting a firearm. [Petition at 6–7].

## Statute of Limitation

Respondents filed a motion to dismiss the petition on the ground that it is barred by the one year period of limitation set forth in 28 U.S.C. § 2244(d). Petitioner filed an opposition to the motion, alleging that he is entitled to tolling of the limitation period because (a) he tried to file a prior federal petition on February 13, 1997 and (b) his personal property was taken from him by prison authorities. Both parties have filed supplemental briefs submitting evidence in support of their positions. Respondents' motion should be denied.

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, which became effective on April 24, 1996. *Fuller v. Roe*, 182 F.3d 699, 702 (9th Cir.1999) (per curiam). The AEDPA provides that

A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Su-

---

1. Although the petition was filed by the Clerk on September 24, 1997, the Court applies the "mailbox rule," and considers the petition filed on the date on which petitioner signed the petition and presumably handed it to the proper prison official for mailing. [Petition at 8]. *See Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (holding that a pro se prisoner's pleading is deemed filed at the moment it is delivered to prison authorities for forwarding to the district court); *Saffold v. Newland,* 224 F.3d 1087, 1091 (9th Cir.2000) (explaining that "mailbox rule" applies to pro se prisoners filing habeas petitions in both federal and state court because "the prisoner is powerless and unable to control the time of delivery of documents to the court.").

preme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Further, the AEDPA provides that

the time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

The record does not contain any facts suggesting the applicability of subsections (B) through (D). Pursuant to subsection (A), the one-year limitations period began to run on the date on which the judgment became final. 28 U.S.C. § 2244(d)(1)(A).

■ Petitioner's conviction became final for purposes of the AEDPA on April 3, 1996—ninety days after the California Supreme Court denied his petition for review. *Bowen v. Roe*, 188 F.3d 1157, 1158–1159 (9th Cir.1999); *see also Holman v. Gilmore*, 126 F.3d 876, 880 (7th Cir.1997)

(explaining that a decision is "final" when the defendant has exhausted state appellate remedies and either the Supreme Court of the United States has denied a petition for certiorari or the time for filing such a petition has expired), *cert. denied*, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998), citing *Allen v. Hardy*, 478 U.S. 255, 258 n. 1, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). Where, as here, a petitioner's conviction became final prior to the enactment of the AEDPA, the one-year statute of limitation does not begin to run until the AEDPA's effective date of April 24, 1996. *Calderon v. United States District Court (Beeler)*, 128 F.3d 1283, 1288–1289 (9th Cir.1997), *cert. denied*, 522 U.S. 1099, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998) & 523 U.S. 1061, 118 S.Ct. 1389, 140 L.Ed.2d 648 (1998), *overruled on other grounds by, Calderon v. United States District Court (Kelly)*, 163 F.3d 530 (9th Cir.1998) (en banc), *cert. denied*, 526 U.S. 1060, 119 S.Ct. 1377, 143 L.Ed.2d 535 (1999). Accordingly, the limitation period for petitioner's federal petition began to run on April 24, 1996 and, absent any tolling, expired on April 24, 1997.[2] *Beeler*, 128 F.3d at 1287. Petitioner did not file this petition until August 26, 1997—four months after the limitation

**2.** It is not entirely clear when the limitation period expires in this situation. Although the Ninth Circuit has stated that the limitation period expires on April 23, 1997, it did so without discussing the application of Rule 6(a) of the Federal Rules of Civil Procedure. *See Saffold v. Newland*, 224 F.3d 1087, 1088 (9th Cir.2000). The three circuits that have directly addressed the question whether the grace period for individuals who were imprisoned at the time the AEDPA took effect should end on April 23, 1997 or on April 24, 1997, all have concluded that the correct date is April 24, 1997. *See Moore v. United States*, 173 F.3d 1131, 1135 (8th Cir.1999) (§ 2255 case); *Flanagan v. Johnson*, 154 F.3d 196, 200–202 (5th Cir.1998) (§ 2254 case); *Mickens v. United States*, 148 F.3d 145, 148 (2d Cir.1998) (§ 2255 case). That is, those courts applied Rule 6(a), which provides, in relevant

part, that "the day of the act, event, or default from which the designated period of time begins to run shall not be included." Under the persuasive reasoning adopted by the Second, Fifth, and Eighth Circuits, April 24, 1996 (the date of enactment of the AEDPA) is excluded from the computation, and petitioners whose convictions became final prior to that date should have until April 24, 1997, rather than merely April 23, 1997, within which to file their federal habeas petitions. *See also United States v. Marcello*, 212 F.3d 1005, 1009 (7th Cir.) (adopting the "anniversary rule" and holding that "[t]he first day of the 1–year limitation period is the day after the Supreme Court denies certiorari, giving defendants until the close of business on the anniversary date of the certiorari denial to file their habeas motion."), *cert. denied*, —— U.S. ——, 121 S.Ct. 188, 148 L.Ed.2d 130 (2000). In this

period expired. Thus, the petition is subject to dismissal unless petitioner is entitled to either statutory or equitable tolling.

**Statutory tolling**

■ As discussed, the limitation period does not run so long as a properly filed state application for post-conviction relief is pending. 28 U.S.C. § 2244(d)(2). Petitioner does not allege that he had any state applications for relief pending after April 24, 1996. Petitioner, however, alleges that he "filed" a **federal** petition on February 13, 1997. No such petition was received by the Court. In addition, federal habeas petitions do not toll the limitation period pursuant to section 2244(d)(2). *Jiminez v. Rice*, 222 F.3d 1210, 1213–1214 (9th Cir.2000). Therefore, petitioner is not entitled to statutory tolling of the limitation period.

**Equitable tolling**

Petitioner alleges that the limitation period should be equitably tolled because extraordinary circumstances beyond his control made it impossible for him to file his petition on time. [Opposition at 1]. He points to two separate events that he believes entitle him to equitable tolling.

■ In order to be entitled to equitable tolling, petitioner must show that he was prevented from filing his petition on time by extraordinary circumstances beyond his control. *Beeler*, 128 F.3d at 1288–1289; *Miller v. New Jersey State Dept. of Corrections*, 145 F.3d 616 (3rd Cir.1998); *Henderson v. Johnson*, 1 F.Supp.2d 650 (N.D.Tex.1998). "When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of

case, however, the timeliness of the petition does not turn on whether Fed.R.Civ.P. 6(a) does or does not apply.

limitations may be appropriate." *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir.1999), citing *Kelly*, 163 F.3d at 541; *Beeler*, 128 F.3d at 1288–1289; *see also Raynor v. Dufrain*, 28 F.Supp.2d 896, 900 (S.D.N.Y. 1998) ("Equitable tolling is warranted when some event effectively prohibits the petitioner from pursuing habeas, such as the misplacement of files, or being denied access to materials necessary to file a habeas petition.").

First, petitioner alleges that he was deprived of his personal property. [Opposition at 1]. Because petitioner is entitled to equitable tolling on the basis of his other allegations, it is unnecessary to address petitioner's loss of property. Nevertheless, the Court notes that in his inmate grievance related to the alleged deprivation of his property, petitioner did not complain that he was deprived of any legal papers necessary for the preparation of his habeas petition. Rather, he complained that his television set was damaged and that other items were "missing." [*See* Opposition, Ex. 1A–2A]. Indeed, as petitioner concedes, he was able to prepare his first habeas petition as early as October 15, 1996 (the date on which petitioner signed the petition itself, as opposed to the request to proceed in forma pauperis, which was signed on February 13, 1997), despite having been deprived of his personal property. [Opposition at 1]. Accordingly, this allegation does not entitle petitioner to equitable tolling.

■ Second, petitioner alleges that he "sent" a federal habeas petition to this Court on February 13, 1997—prior to the expiration of the one-year limitation period. [Opposition at 1 & 1998 Reynolds Declaration at 1].[3]

**3.** Petitioner's declarations were filed on different dates and in response to the Court's orders. The first declaration was filed on December 22, 1997, and is attached to petitioner's opposition to the motion to dismiss.

Based upon the evidence presented by both parties, the Court makes the following findings of fact. Petitioner prepared his federal petition while incarcerated at Centinela State Prison. [1997 & 1998 Reynolds Declarations at 1; Opposition, Ex. C at 1]. On February 13, 1997, petitioner signed the last page of the petition (a Declaration in Support of Request to Proceed In Forma Pauperis) and had that page signed by Correctional Captain John Nettles. [1997 & 1998 Reynolds Declarations at 1; Opposition, Ex. C at 8]. Later the same day, petitioner, who was in administrative segregation at the time, hand delivered the petition to the prison staff member who was working at the time of mail pick up for forwarding to the Court. [1997 & 1998 Reynolds Declarations at 1]. On February 24, 1997, petitioner was transferred from Centinela State Prison to Pelican Bay State Prison. [Respondent's Supplemental Brief, Ex. H].

The February 13, 1997 petition was never received by the Court. The prison mail log reveals no entry for any mail sent to or from this Court in February, 1997. [Respondent's Supplemental Brief, Ex. F]. Petitioner explains that he waited for a response from the Court, but never received one. Petitioner did not make inquiries to the Court because he believed a response to his petition would be forthcoming. After waiting for seven months, petitioner prepared a second petition and sent it from Pelican Bay State Prison. [1997 & 1998 Reynolds Declarations at 1]. The second petition was filed in this Court on September 24, 1997.

Petitioner's version of events is corroborated by a copy of his February 13, 1997 federal petition, [Opposition, Ex. C], the last page of which was signed by Correction Captain John Nettles on February 13, 1997. [Opposition, Ex. C at 10]. Respon-

dents have not presented any direct evidence suggesting that petitioner's statements made under penalty of perjury are false. For example, respondents do not suggest that the petition dated February 13, 1997 and signed by Correctional Captain John Nettles is inauthentic. Further, respondents fail to present any direct evidence contradicting petitioner's allegation that once signed by petitioner and by Captain Nettles, petitioner handed his petition to the appropriate prison official for mailing.

Instead, respondents submit evidence describing the mail systems at Centinela and Pelican Bay State Prisons, as well as a legal mail log which, as discussed, fails to reflect any legal mail sent by or to petitioner during February, 1997. [Respondents' Supplemental Brief, Exs. F, G, H, I]. Among other things, respondents' evidence reveals the following:

1. Both Centinela and Pelican Bay State Prisons maintain a legal mail log for all inmates. [Respondents' Supplemental Briefs, Exs. F & I]. The mail log contains notations for all legal mail sent through the prison mail system to or from federal or state courts. [Respondents' Supplemental Briefs, Exs. F & I].

2. At Centinela State Prison, legal mail is processed as follows:

[A]n inmate must inform the appropriate correctional officer in his yard that he has legal mail. The inmate must hand the legal mail to the correctional officer. In the inmate's presence, the correctional officer inspects the mail for contraband, places it in the envelope, seals the envelope, and write[s] his initials and the date over the flap of the envelope. The item is then dropped into the legal mail collection drop on that yard. The legal

---

The second declaration was filed on February 9, 1998 and, is attached to petitioner's supplemental brief. The Court refers to the declarations by dates.

mail is picked up by prison staff and taken to the mailroom. There the legal mail items are logged by mailroom staff. An item is "logged" by writing the name and general location of the sender or receiver and the date received or sent on the CDC Form 119. [Respondents' Supplemental Brief, Ex. I].

3. The accounting office at Centinela State Prison processes inmate requests for certification—including forms such as the Declaration in Support of Request to Proceed in Forma Pauperis completed by petitioner. In order to process such forms, the inmate must submit his completed and signed declaration to the accounting office which completes the form and returns it to the inmate "through established prison procedures." The accounting office does not mail the certification.. [Respondents' Supplemental Brief, Ex. G].

Based upon this general evidence regarding the prison mail system and the procedures followed by the prison accounting office, respondents contend that petitioner cannot show that he "mailed" the petition on February 13, 1997. [Respondents' Supplemental Brief at 7]. Respondents argue that the mail log is "reliable" because it accurately reflects correspondence between petitioner and this Court after petitioner filed his August 26, 1997 petition and, therefore, it is sufficient to rebut petitioner's sworn declaration. [Respondents' Supplemental Brief at 8].

The circumstantial evidence submitted by respondents, however, is insufficient to rebut petitioner's direct evidence. The prison mail log merely confirms the fact that the February 13, 1997 petition was never mailed by the prison, something already suggested by the fact that the petition was never received by the Court. It does not rebut petitioner's specific factual allegation that he handed his petition to the prison official assigned to his unit for mailing to the Court.[4] Therefore, the Court finds that petitioner handed the February 13, 1997 petition to the proper prison official on February 13, 1997 and, after failing to hear any response from the Court, petitioner prepared and mailed his August 26, 1997 petition.[5]

Petitioner acted with reasonable diligence in pursuing his claims. Petitioner relied upon prison officials at Centinela State Prison to mail his petition to this Court and then waited for the Court to respond. As petitioner explains, "I did not inquire to the court about [the] petition [be]cause I felt the Court would be giving me a response. I did not know how much time [the] Court had to respond so I waited but when I heard nothing for over 7 months, I prepared and submitted another from Pelican Bay State prison which made it to the Court." [1998 Reynolds Declaration at 1]. This is not a case where petitioner opted to rely on another inmate or family member to file his petition. *See, e.g., Paige v. United States,* 171 F.3d 559, 561 (8th Cir.1999) (finding that equitable tolling was not available to prisoner whose petition was prepared by an inmate in a different prison, and as a result of delay in their communications, was filed too late); *Henderson,* 1 F.Supp.2d at 655 (holding that equitable tolling did not apply where a fellow inmate allegedly had fraudulently represented to the petitioner that he had

---

4. It is not petitioner's burden to prove that the prison official lost the petition or that the prison mail system did not work as it was designed **after** the petition left his control and was entrusted to the proper prison official. *See Houston,* 487 U.S. at 270–272, 108 S.Ct. 2379.

5. Petitioner's version of events also makes sense. There is no discernible reason why petitioner would have gone to the trouble of preparing his February 13, 1997 petition, and obtained the requisite certification, but then failed to take the final and simplest step of handing it to a prison official for mailing.

timely filed petition for him). To the contrary, petitioner necessarily relied upon the only means to communicate with the Court available to him.[6] Further, after complying with all of the prison mail procedures, petitioner was entitled to assume that the petition was properly mailed. He was not required to send letters to the Court inquiring about the status of his case—at least not before several months had passed.

In *Miles,* a case similar to this one, the Ninth Circuit concluded that the petitioner was entitled to equitable tolling. *Miles,* 187 F.3d at 1107. The petitioner in *Miles* signed his federal petition and in forma pauperis declaration on April 18, 1997, several days before the AEDPA's limitation expired. *Miles,* 187 F.3d at 1105. He then submitted the petition to prison authorities with instructions to mail his materials to the district court and to enclose a check for the requisite filing fee. The prison accounting office waited until April 30, 1997 before debiting the filing fee from the petitioner's account, and then returned the petition and the check to the petitioner on an unspecified date. *Miles,* 187 F.3d at 1105–1106. On June 3, 1997, the petition-er resubmitted his petition and filing fee to prison authorities for mailing, and the petition eventually was filed in the district court on June 17, 1997. *Miles,* 187 F.3d at 1106.

The Ninth Circuit held that the limitation period was equitably tolled. As the court explained,

> as an incarcerated pro se litigant, Miles depended on prison authorities to draw on his trust account and to prepare a check for the filing fee. He further relied on these same authorities to mail his check and petition to the district court. Once Miles made his request, any delay on the part of prison officials in complying with Miles' instructions was not within Miles' control. Nor did Miles fail to exercise due diligence in preparing and submitting his petition. Within seventeen days after his counsel informed him of the looming deadline, Miles submitted his petition to prison authorities.

*Miles,* 187 F.3d at 1107.

Like the petitioner in *Miles,* petitioner relied upon the prison official to whom he handed his petition and certification and exercised due diligence in preparing and submitting his petition.[7] Because petition-

---

6. As the Supreme Court has explained,

> The situation of prisoners seeking to appeal without the aid of counsel is unique.... Other litigants may choose to entrust their appeals to the vagaries of the mail and the clerk's process for stamping incoming papers, but only the pro se prisoner is forced to do so by his situation.... Worse, the pro se prisoner has no choice but to entrust the forwarding of his notice of appeal to prison authorities whom he cannot control or supervise and who may have every incentive to delay. No matter how far in advance the pro se prisoner delivers his notice to the prison authorities, he can never be sure that it will ultimately get stamped "filed" on time. And if there is a delay the prisoner suspects is attributable to the prison authorities, he is unlikely to have any means of proving it, for his confinement prevents him from monitoring the process sufficiently to distinguish delay on the part of prison authorities from slow mail service or the court clerk's failure to stamp the notice on the date received. Unskilled in law, unaided by counsel, and unable to leave the prison, his control over the processing of his notice necessarily ceases as soon as he hands it over to the only public officials to whom he has access—the prison authorities—and the only information he will likely have is the date he delivered the notice to those prison authorities and the date ultimately stamped on his notice.

*Houston,* 487 U.S. at 270–272, 108 S.Ct. 2379.

7. The Court's conclusion that petitioner is entitled to equitable tolling will not extend to every prisoner who signs a declaration indicating that he has attempted to file his federal petition by handing it to a prison official. As discussed, petitioner presents evidence—in-

er is entitled to equitable tolling, respondents' motion to dismiss the petition as untimely should be **denied.**

### The merits

### Standard of review

Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *see Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.1999).

As recently explained by the Supreme Court, section 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The threshold question under AEDPA is whether petitioner "seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams,* 120 S.Ct. at 1511.

The Supreme Court clarified the meaning of section 2254(d), holding that:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this

Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 120 S.Ct. at 1523; *see Weighall v. Middle,* 215 F.3d 1058, 1061 (9th Cir. 2000) (discussing *Williams* ).

The federal court making the "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 120 S.Ct. at 1521; *Weighall,* 215 F.3d at 1062. Although the Supreme Court did not provide a definition of "objectively unreasonable," it did make it clear that an unreasonable application of federal law is different from an incorrect application of federal law, explaining that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 120 S.Ct. at 1522.

Finally, state court findings of fact are presumed to be correct unless petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**1. Failure to instruct the jury with the elements of the allegation that petitioner personally used a firearm**

■ In the underlying criminal prosecution, the State alleged that in the course of the offense of assault with a firearm, petitioner personally used a firearm within the

---

cluding a document signed and dated by a prison official—which respondents do not allege to be inaccurate. Thus, this is not a

situation in which the evidence presented consists of nothing more than a petitioner's self-serving declaration.

meaning of section 12022.5 of the California Penal Code.[8] [CT 74]. The jury found the allegation true. [CT 160]. As a result of the jury's finding, petitioner was sentenced to an additional five years in state prison. [CT 166].

■ The parties agree that the trial court failed to instruct the jury on the elements of personal use of a firearm pursuant to section 12022.5.[9] Petitioner contends that the trial court's failure to instruct the jury as to the elements of the personal use of a firearm deprived him of his constitutional right to have a jury decide the truth of the sentence enhancement allegation. [Petition at 6]. Respondents, on the other hand, argue that petitioner has no constitutional right to jury fact-finding because the sentence enhancement is a sentencing factor, and not an "element of the crime." [Answer at 15–16]. Respondents explain that because the right to a jury trial on the sentence enhancement arose solely from a state statute, namely, California Penal Code § 969c, the erroneous omission of the jury instruction amounted to only a state law error. As respondents correctly point out, under California law, a defendant's statutory right to jury findings on a use enhancement is constitutionally qualified by the duty of California appellate courts to examine the "entire cause"

when instructional error has occurred and to affirm the judgment absent a "miscarriage of justice." *See People v. Wims*, 10 Cal.4th 293, 310, 314–316, 41 Cal.Rptr.2d 241, 895 P.2d 77 (1995). Thus, state law errors in sentencing enhancement findings warrant reversal under California law only if, after review of the entire record, the state court concludes that it is reasonably probable that the defendant would have received a more favorable result if the correct instruction had been given. [Answer at 15–17]. *See Wims*, 10 Cal.4th at 314–316, 41 Cal.Rptr.2d 241, 895 P.2d 77.

The California Court of Appeal agreed with respondents' position, concluding that although the trial court erred by failing to instruct the jury regarding the elements of the personal use of a firearm sentence enhancement, the error was harmless. [Answer, Ex. B at 55]. Following the California Supreme Court's holding in *Wims*, 10 Cal.4th at 315, 41 Cal.Rptr.2d 241, 895 P.2d 77, the California Court of Appeal examined the entire record to determine whether the failure to instruct the jury prejudiced petitioner. [Answer, Ex. B at 55]. The court noted that after petitioner was cornered by the victim, "he leaned out of his jeep and pointed a gun in [the victim's] direction. Fearing harm, [the victim] drove away." [Answer, Ex. B

8. Under California law, the allegation that a defendant personally used a firearm in the commission of the underlying offense is considered a "sentence enhancement," subjecting the defendant to a "separate, additional" sentence. At least at the time of petitioner's conviction, such allegations were considered "penalty provisions," not substantive crimes. *See People v. Wims*, 10 Cal.4th 293, 305, 41 Cal.Rptr.2d 241, 895 P.2d 77 (1995).

9. The jury should have been instructed as follows:

If you find the defendant guilty of the crime charged, you must determine wheth-

er the defendant personally used a firearm in the commission of that felony.

The word "firearm" includes [any device designed to be used as a weapon from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion.] [The "firearm" need not be operable.]

The term "personally used a firearm," as used in this instruction, means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it.

CALJIC 17.19. Instead, the jury received **no instruction whatsoever.**

at 55]. After explaining that a personal use of a firearm finding requires a showing that the defendant engaged in "conduct which produces a fear of harm or force by means of display of a firearm in aiding the commission of one of the specified felonies," the court explained that the evidence that petitioner personally used a firearm "was compelling." Finally, the court concluded that it was "not reasonably probable that a more favorable result would have been reached had the gun use instruction been given." [Answer, Ex. B at 55].[10]

Petitioner is entitled to relief only if he demonstrates that the state court's conclusion was contrary to or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. This phrase "refers to the holdings, as opposed to the dicta, of [the Supreme Court]'s decisions as of the time of the relevant state-court decision." *Williams*, 120 S.Ct. at 1523. The starting point, then, is to determine what Supreme Court holdings existed at the time petitioner's conviction became final on April 3, 1996.

It has long been established that the Constitution guarantees criminal defendants the right to a trial by jury, and the right to have every element of the offense proved beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 361–364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Duncan v. Louisiana*, 391 U.S. 145, 150–156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Jury instructions that allow a jury to convict without finding every element of the offense violate *In re Winship*'s requirement that every fact necessary to constitute the crime must be proven beyond a reasonable doubt. *See Sandstrom v. Montana*, 442 U.S. 510, 521–524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Keating v. Hood*, 191 F.3d 1053, 1061 (9th Cir.1999). The Constitution, however, does not require a jury determination of facts properly characterized as sentencing factors, as opposed to elements of a charged crime, even where the sentence turns on a specific finding of fact. *McMillan v. Pennsylvania*, 477 U.S. 79, 93, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

At the time that petitioner's conviction became final, *McMillan* was the controlling Supreme Court authority on the issue of a criminal defendant's entitlement to a jury trial on allegations properly labeled "sentencing factors" rather than elements of a criminal offense. In *McMillan*, the Supreme Court held that the Sixth Amendment does not require a jury determination of facts when a statute makes weapon possession a sentencing factor rather than an element of the crime. *McMillan*, 477 U.S. at 93, 106 S.Ct. 2411. At issue in *McMillan* was a Pennsylvania statute that characterized "visible possession of a firearm" as a sentencing factor rather than as an element of an offense. Under the statute, after a defendant was convicted of the underlying offense, the sentencing judge would determine by a preponderance of the evidence whether the defendant had visibly possessed a firearm while committing the offense. If so, the defendant received a mandatory minimum sentence of five years. *McMillan*, 477 U.S. at 86, 106 S.Ct. 2411.

The Supreme Court found that the statute was constitutional. In so concluding, the Court found it important that the stat-

---

**10.** The California Supreme Court denied petitioner's petition for review without explanation. [Answer, Ex. C]. In analyzing the reasonableness of the state court's determination of petitioner's claim, the Court "looks through" the California Supreme Court's unexplained disposition to the last reasoned decision of a state court, which in this case is the opinion of the California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

ute did not alter the maximum penalty for the crime committed, but instead, "operated solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm." *McMillan,* 477 U.S. at 87–88, 106 S.Ct. 2411. The Court also considered other relevant factors, including (1) whether the state legislature had attempted to circumvent due process protections by redefining elements of an offense as sentencing factors, and (2) whether the legislature has relieved the prosecution of its burden of proving all of the elements of an offense beyond a reasonable doubt. *McMillan,* 477 U.S. at 86–90, 106 S.Ct. 2411. The Supreme Court reiterated that in determining what facts must be proved beyond a reasonable doubt, the state legislature's definition of the elements of the offense is "usually dispositive." *McMillan,* 477 U.S. at 85, 106 S.Ct. 2411, citing *Patterson v. New York,* 432 U.S. 197, 210–211 & n. 12, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). On the other hand, the Court recognized that there "are constitutional limits to the State's power in this regard; in certain circumstances *Winship*'s reasonable-doubt requirement applies to facts not formally identified as elements of the offense charged." *McMillan,* 477 U.S. at 86, 106 S.Ct. 2411. Nevertheless, in determining that the Pennsylvania statute did not transgress those limits, the *McMillan* Court declined to define precisely the constitutional limits on the state's ability to exempt facts from the ambit of *Winship* by labeling certain them "sentencing factors." *McMillan,* 477 U.S. at 86, 106 S.Ct. 2411.

Under California law, punishment based upon alleged possession or use of a weapon, such as the one imposed in petitioner's case, are classified as sentencing enhancements, not as separate crimes. *See Wims,* 10 Cal.4th at 304, 314, 41 Cal. Rptr.2d 241, 895 P.2d 77 (collecting cases).

In *Wims,* the California Supreme Court considered the factors identified in *McMillan* and determined that they supported the conclusion that a sentence enhancement based upon the defendant's alleged possession of a weapon was properly characterized as a sentencing factor. *Wims,* 10 Cal.4th at 306–308, 41 Cal. Rptr.2d 241, 895 P.2d 77. The court recognized that unlike the statute at issue in *McMillan,* California's enhancement statute imposed a sentence beyond the maximum for the underlying offense, but concluded that this fact alone did not trigger the Sixth Amendment right to a jury trial. *Wims,* 10 Cal.4th at 308–309, 41 Cal. Rptr.2d 241, 895 P.2d 77. Relying on *McMillan,* the court concluded that there was no constitutional right to a jury trial on sentence enhancements of the type imposed on petitioner. *Wims,* 10 Cal.4th at 305–306, 41 Cal.Rptr.2d 241, 895 P.2d 77.

Although the California Supreme Court concluded in *Wims* that there was no constitutional right to a jury trial, the court also noted that a California statute provides for jury trials on sentence enhancements. Cal.Penal Code § 969. It determined that the trial court had erred by failing to instruct the jury on the factual elements that the prosecution was required to prove before the jury could properly find true the enhancement allegation, but further determined that the error merely amounted to state law error which did not require reversal under state law absent a "miscarriage of justice." *Wims,* 10 Cal.4th at 302, 314–315, 41 Cal.Rptr.2d 241, 895 P.2d 77. It acknowledged that under the state's harmless error review, the defendant was entitled to relief only if "it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of error." *Wims,* 10 Cal.4th at 315, 41 Cal. Rptr.2d 241, 895 P.2d 77, quoting *People v.*

*Watson,* 46 Cal.2d 818, 836, 299 P.2d 243 (1956).

The Ninth Circuit has applied *McMillan* with similar results. In *Nichols v. McCormick,* 929 F.2d 507, 508 (9th Cir.1991), for example, the Ninth Circuit considered a Montana statute that provided an additional penalty of two to ten years for a defendant convicted of an offense who was found to have used a firearm in the commission of the offense. *Nichols,* 929 F.2d at 508. The court rejected the petitioner's argument that the statute created a separate substantive offense, concluding that the statute provided "only for enhancement of a penalty once the defendant has been found guilty of an underlying offense." *Nichols,* 929 F.2d at 509. The court recognized that Montana sentencing statute was unlike the statute in *McMillan* because it permitted imposition of a penalty beyond the maximum permitted by the underlying offense conviction. Nevertheless, the court refused to read *McMillan* as establishing a bright line test providing that whenever a statute increases the length of a sentence beyond the maximum, it must be considered an element of the offense. *See Nichols,* 929 F.2d at 510–511. Instead, the Ninth Circuit remarked that whether a sentencing statute is constitutional depends on "differences of degree," to which several factors identified by the Supreme Court in *McMillan* were relevant. *Nichols,* 929 F.2d at 510–511. Significantly, the court stated that "[t]he import of *McMillan* is that a state is free to define possession of a weapon as a sentencing factor." *Nichols,* 929 F.2d at 511. Finally, the court concluded that because the Montana statute did not create a separate substantive offense, the Sixth Amendment right to a trial by jury did not attach. *Nichols,* 929 F.2d at 509.

In a recent case similar to this one, the Ninth Circuit upheld California's classification of a special circumstance of first degree murder as a sentencing factor. *Arreguin v. Prunty,* 208 F.3d 835 (9th Cir. 2000). At issue in *Arreguin* was section 190.2(a) of the California Penal Code, which provides that a "special circumstance" to murder exists if the jury finds that a defendant who is not the actual killer was a major participant in the underlying felony which resulted in death. If the special circumstance allegation is found true, then the defendant is subject to a term of life without the possibility of parole. *Arreguin,* 208 F.3d at 835–837; *see also Arreguin v. Prunty,* 42 F.Supp.2d 986, 989 n. 4 (C.D.Cal.1998), *rev'd,* 208 F.3d 835 (9th Cir.2000). Like the use of a firearm sentence enhancement alleged in petitioner's case, California law requires that a jury find a special circumstance allegation to be true beyond a reasonable doubt. Cal.Penal Code §§ 190.2(a), 190.4. *Arreguin,* 208 F.3d at 837. California also permits appellate review of instructional error regarding special circumstances to determine whether the error was harmless. *Arreguin,* 208 F.3d at 837; *People v. Odle,* 45 Cal.3d 386, 414, 247 Cal.Rptr. 137, 754 P.2d 184 (1988).

The trial court in *Arreguin* had failed to properly instruct the jury on the requirement that it find the defendant was a "major participant" in the underlying felony rather than simply a "participant." *Arreguin,* 208 F.3d at 837. The California Court of Appeal reviewed the instructional error and concluded that "under any reasonable interpretation of the evidence, [Arreguin] was a major participant and the error was harmless beyond a reasonable doubt." *Arreguin,* 208 F.3d at 837.

The petitioner in *Arreguin* argued that he was denied of a liberty interest created by state law and denied the right to a jury determination of the special circumstance allegation under the Sixth and Fourteenth Amendments. The district court granted the petition on the ground that the state

had created a liberty interest in a jury determination of special circumstances and that petitioner's due process rights were violated by the instructional error. *Arreguin*, 42 F.Supp.2d at 990–992. The Ninth Circuit reversed, holding that California had created only a "qualified liberty interest," and that application of the harmless error analysis on appellate review satisfied due process. *Arreguin*, 208 F.3d at 837.

The Ninth Circuit also rejected the petitioner's federal constitutional claim, concluding that the special circumstance was properly considered a sentencing factor under *McMillan*, and therefore no constitutional right to a jury trial attached. *Arreguin*, 208 F.3d at 837–838. The court explained that three factors were relevant to determining whether due process was violated by the classification of a particular fact as a sentencing factor: (1) whether the statute altered the maximum penalty available for the crime committed, (2) whether the statute negated the presumption of innocence or relieved the prosecution of its burden of proving guilt, and (3) whether the statute created a separate offense calling for a separate penalty. *Arreguin*, 208 F.3d at 838, citing *United States v. Goodell*, 990 F.2d 497, 499–500 (9th Cir.1993). The court evaluated each factor, and found that the statute did not alter the maximum penalty, did not dispense with the presumption of innocence or relieve the prosecution of its burden of proving guilt, and did not create a separate crime with a separate punishment. *Arre-*

*guin*, 208 F.3d at 838. In addition, the court noted that the California Supreme Court had already construed the statute as a sentencing provision. *Arreguin*, 208 F.3d at 838, citing *Odle*, 45 Cal.3d at 411 n. 11, 247 Cal.Rptr. 137, 754 P.2d 184. Finally, the court concluded that because the special circumstance defined in section 190.2 of the California Penal Code is a sentencing factor and not an element of the offense, the petitioner had no federal right to a jury determination. *Arreguin*, 208 F.3d at 838.

In this case, the state court rejected petitioner's instructional error claim based upon an interpretation of *McMillan* that is consistent with the interpretations adopted in *Wims*, *Nichols* and *Arreguin*. That is, the state court found that the sentence enhancement based upon the use of a firearm in the commission of an offense was a sentencing factor. Given that classification, the state court determined that petitioner had no federal constitutional right to a jury trial on the use of a firearm allegation. Because the failure to instruct regarding the sentence enhancement violated only a state created right, the state court applied a harmless error test that permitted it to consider the entire record. Although, as discussed below, California's interpretation of *McMillan* has since proved to be incorrect, the state court's determination was a reasonable application of clearly established Supreme Court authority existing at the time petitioner's conviction became final.[11] If the story

---

11. The reasonableness of the state court determination is confirmed by the decision in *Johnson v. Gomez*, 1997 WL 703770 (N.D.Cal. 1997). When faced with facts nearly identical to those presented in this case, a federal district court reached the same result as the California Court of Appeal did in this case. In *Johnson*, the court upheld California's classification of the firearm use enhancement contained in section 12022.5 of the California Penal Code as a sentencing factor, rather than a separate offense. The court noted that the

penalty enhancing effect of the statute "is not, standing alone, dispositive of the question whether the statute characterizes an essential element of the crime or is simply a sentence enhancement." *Johnson*, 1997 WL 703770 *7–8. The court considered the relevant factors identified in *McMillan*, including the fact that section 12022.5 increased the maximum penalty for the underlying offense, and concluded that section 12022.5 was properly considered a sentence enhancement. Therefore,

ended here, petitioner would not be entitled to relief.

Last year, however, the Supreme Court revisited *McMillan* and held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 486–92 & n. 13, 120 S.Ct. 2348, 2361–2363 & n. 13, 147 L.Ed.2d 435 (2000). The court noted that *McMillan* did not

> budge from the position that (1) constitutional limits exist to States' authority to define away facts necessary to constitute a criminal offense . . . , and (2) that a state scheme that keeps from the jury facts that "expos[e] [defendants] to greater or additional punishment," . . . may raise serious constitutional concern.

*Apprendi*, 120 S.Ct. at 2360, quoting *McMillan*, 477 U.S. at 85–88, 106 S.Ct. 2411. Making it clear that it was not overruling *McMillan*, the Supreme Court nonetheless limited *McMillan* "to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself." *Apprendi*, 120 S.Ct. at 2361 n. 13.

In *Apprendi*, the Supreme Court invalidated a New Jersey statutory scheme enhancing sentences for defendants found guilty of "hate crimes." After a defendant was convicted by a jury for the substantive offense, state law provided that the judge was allowed to impose an additional sentence after finding, by a preponderance of the evidence, that the defendant's purpose in committing the offense was to intimidate the victim on the basis of a particular characteristic that the victim possessed. *Apprendi*, 120 S.Ct. at 2363–2364. The Supreme Court rejected the state's attempt to defend the validity of its procedure by characterizing the finding as a "sentencing factor" rather than as an element of a distinct hate crime offense. *Apprendi*, 120 S.Ct. at 2364–2365. The Supreme Court explained that the "label" given the finding is irrelevant; instead, the inquiry is one of effect—"does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 120 S.Ct. at 2365. Thus,

> when the term "sentence enhancement" is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense.

*Apprendi*, 120 S.Ct. at 2365 n. 19.

Under *Apprendi*, defendants such as petitioner are entitled to have a jury determine beyond a reasonable doubt whether their conduct fell within the provisions of section 12022.5. Therefore, after *Apprendi*, the same constitutional guarantees regarding the right to a jury trial on all of the elements of an offense attach to "sentence enhancements" that subject a criminal defendant to a sentence greater than the maximum provided for the conviction for the underlying offense.[12] Before *Ap-*

---

instructional error in relation to the enhancement did not violate any constitutional right to a jury trial. *Johnson*, 1997 WL 703770 *8.

**12.** As Justice Scalia stated, the Sixth Amendment's

guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury" has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment must be found by the jury.

*Apprendi*, 120 S.Ct. at 2367 (Scalia, J., concurring).

*prendi,* however, a criminal defendants' right to a jury trial on a sentence enhancement such as section 12022.5 was not "clearly established law" within the meaning of the AEDPA. Petitioner, then, can obtain relief only if the holding in *Apprendi* is applicable to his case.

**The Teague doctrine of non-retroactivity and its exceptions**

Before the AEDPA, a habeas petitioner was not entitled to benefit from a new constitutional rule of criminal procedure that was adopted after the petitioner's conviction became final on direct review. *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion); *Jones v. Smith,* 231 F.3d 1227, 1236 (9th Cir.2000). A case announces a "new rule" under *Teague* when it "breaks new ground or imposes a new obligation on the States or the Federal Government [or] if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Goeke v. Branch,* 514 U.S. 115, 118, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995) (per curiam), quoting *Teague,* 489 U.S. at 301, 109 S.Ct. 1060; *Jones,* 231 F.3d at 1236.

Prior to *Apprendi,* the fact that a sentencing factor increased the maximum penalty was not necessarily sufficient to require the state to provide a jury trial in order to comply with the Sixth Amendment. Thus, whether a jury trial was required on the truth of a sentence enhancement such as section 12022.5 was debatable before *Apprendi.* After *Apprendi,* however, the answer is clearly "yes." *Apprendi,* then, announced a "new rule." *See Jones,* 231 F.3d at 1236 ("Under either definition, *Apprendi* certainly established a new rule...."); *Ware v. United States,* 124 F.Supp.2d 590, 594–95 (M.D.Tenn.2000) (holding that *Apprendi* is a new rule under *Teague* ); *United States v. Murphy,* 109 F.Supp.2d 1059, 1064 (D.Minn.2000) (finding that *Apprendi* an-

nounced a "sweeping new requirement" that was subject to *Teague* 's rules regarding retroactivity on collateral review); *see generally, Teague,* 489 U.S. at 301, 109 S.Ct. 1060 (explaining that a new rule is one which "breaks new ground or imposes a new obligation on the States or Federal Government").

Under *Teague,* the new rule announced in *Apprendi* is not to be applied retroactively on collateral review unless it falls within one of two exceptions. The new rule may be applied retroactively on collateral review if (1) "it places certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe," or (2) "it requires the observance of those procedures that ... are implicit in the concept of ordered liberty." *Teague,* 489 U.S. at 311, 109 S.Ct. 1060 (internal quotations omitted). This second exception is reserved for "watershed rules of criminal procedure" that are essential to the fundamental fairness of a criminal proceeding. *O'Dell v. Netherland,* 521 U.S. 151, 167, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997).

The rule announced in *Apprendi* falls within the second exception to *Teague.* The language of *Apprendi* itself recognizes that the holding was a "watershed rule" essential to the fundamental fairness of a criminal proceeding. For example, the Supreme Court described the issue as follows:

At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," ... and the guarantee that [i]n all criminal prosecutions, the accused shall enjoy the right to a "speedy and public trial, by an impartial jury," ... Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that he is guilty of every element of the

crime with which he is charged, beyond a reasonable doubt." As we have, unanimously, explained, the historical foundation for our recognition of these principles extends down centuries into the common law.... [T]rial by jury has been understood to require that the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors.... Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt.

*Apprendi,* 120 S.Ct. at 2355–2356 (citations omitted).[13] The Supreme Court also observed that

[t]here is a vast difference between ... a judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

*Apprendi,* 120 S.Ct. at 2366.

The Supreme Court's own characterization of the rule announced in *Apprendi* demonstrates its qualification as a watershed rule essential to the fairness of a criminal proceeding. *See Hoffman v. Arave,* 236 F.3d 523, 548 (9th Cir.2001) (Pregerson, J., concurring) ("I would adhere to the Supreme Court's characterization of the rule at stake in *Apprendi* and find that the right to a jury determination of an element of capital murder, the presence of an aggravating circumstance, is a "bedrock right" within the meaning of the second *Teague* exception."); *Mur-*

*phy,* 109 F.Supp.2d at 1063–1065 (holding that *Apprendi* announced a rule of watershed importance falling under the second exception to the *Teague* nonretroactivity principle and applying the rule to a motion pursuant to 28 U.S.C. § 2255).

Not only does the *Apprendi* rule involve the core right to a jury trial, it involves the application of the beyond a reasonable doubt standard. As the Supreme Court explained in *Winship,*

the reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law."

*In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (citation omitted).

Requiring that a unanimous jury find beyond a reasonable doubt that the defendant committed the charged act is "central to an accurate determination of innocence or guilt." *Teague,* 489 U.S. at 313, 109 S.Ct. 1060; *see Darity v. United States,* 124 F.Supp.2d 355, 358–59 (W.D.N.C.2000) ("Clearly, the Court itself considers the *Apprendi* rule of fundamental constitutional import", resonating its previous decision in *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), that the denial of the right to a jury verdict beyond a reasonable doubt is a "structural defect" "without which a criminal trial cannot reliably serve its function."). The rule of *Apprendi,* then, falls squarely within the

---

**13.** Indeed, at least one Justice recognized the rule announced in *Apprendi* a "watershed change in constitutional law...." *See Apprendi,* 120 S.Ct. at 2381 ("Today, in what will surely be remembered as a watershed change in constitutional law, the Court imposes as a constitutional rule the principle it first identified in *Jones [v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) ].") (O'Connor, J., dissenting).

second *Teague* exception. *See Hoffman*, 236 F.3d at 548 (Pregerson, J. concurring) (stating that *Apprendi*'s rule requiring jury trial on any fact increasing punishment falls within second *Teague* exception); [14] *Murphy*, 109 F.Supp.2d at 1063–1064 ("there can be little doubt that the sweeping new requirement announced in *Apprendi* is so grounded in fundamental fairness that it may be considered of watershed importance. Accordingly, the court concludes that the *Apprendi* decision falls under the second exception to the *Teague* nonretroactivity principle and must be applied to this section 2255 motion."); *Illinois v. Beachem*, — N.E.2d —, 2000 WL 1800441 (Ill.App.2000) (holding that *Apprendi* applies retroactively on collateral review because it "not only safeguards fundamental fairness; its reasonable doubt standard provides the only measure of accuracy in extended sentencing."); *see also Nutter v. White*, 39 F.3d 1154, 1157–1158 (11th Cir.1994) (holding that the rule announced in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), that certain jury instructions on the beyond-a-reasonable-doubt standard violate due process, fits within the second *Teague* exception because "[t]he reasonable doubt standard guards against conviction of the innocent by ensuring the systematic accuracy of the criminal system" and an improper reasonable doubt charge "undermines the fundamental fairness of every trial in which it is used"); *but see*

*United States v. Pittman*, 120 F.Supp.2d 1263, 1270 (D.Or.2000) (holding that *Apprendi* does not fall within *Teague*'s second exception because "shifting an element of the offense from jury to judge and utilizing a preponderance rather than a beyond a reasonable doubt standard [do] not implicate fundamental fairness" and do not directly relate to the accuracy of the conviction or sentence, and noting that "the factual inquiry and determinations were made; they were simply made by a different factfinder."); *Klein v. United States*, 125 F.Supp.2d 460, 467 (D.Wyo. 2000) (holding that "*Apprendi* does not set down a new constitutional rule of criminal procedure which improves the accuracy in determining guilt or innocence of the defendant. Therefore this court does not find that *Apprendi* falls under any of the exceptions to the nonretroactivity rule," and alternatively stating that even if *Apprendi* applied retroactively, it would not benefit the petitioner); *Ware v. United States*, 124 F.Supp.2d 590, 599–600 (M.D.Tenn.2000) (concluding that *Apprendi* does not fall within the second *Teague* exception based upon finding that it was unlikely that submitting the issue of the weight of drugs to a jury to decide beyond a reasonable doubt instead of submitting the issue to a judge to decide by a preponderance of the evidence would "greatly increase the likelihood of an accurate determination and thereby increase the fundamental fairness of the trial.").[15]

**14.** The Ninth Circuit's decision in *Jones* does not suggest otherwise. In *Jones*, 231 F.3d at 1238, the Ninth Circuit held that "the *Apprendi* rule, at least as applied to the omission of certain necessary elements from the state court information, is neither implicit in the concept of ordered liberty nor an absolute prerequisite to a fair trial.". *Jones*, 231 F.3d at 1238. The court made clear more than once that its holding was limited to the particular issue on appeal—namely, the discrepancy between an information and the charge actually submitted to the jury. *Jones*, 231 F.3d at

1238. This not the same as the issue presented in this case. *See Pittman*, 120 F.Supp.2d at 1268–1269 (explaining that *Jones* did not determine whether *Apprendi* should apply retroactively insofar as it announces a new rule regarding imposition of a sentence enhancement by a judge under a preponderance of the evidence standard rather than a jury under a reasonable doubt standard).

**15.** It is worth noting that nearly all of the cases addressing the retroactivity of *Apprendi* involve federal criminal convictions in which the defendant's sentence was enhanced based

**Can this Court apply *Apprendi* retroactively?**

It seems clear that *Teague* survived the AEDPA, at least in part. *See Breard v. Greene*, 523 U.S. 371, 377, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam) (explaining in a post-AEDPA case that *Teague* barred the petitioner's claim); *Jones*, 231 F.3d at 1236–1238 (applying *Teague* in post-AEDPA case to conclude that the petitioner was not entitled to relief on collateral review); *Scott v. Baldwin*, 225 F.3d 1020, 1023 n. 7 (9th Cir. 2000) (assuming that *Apprendi* establishes a new rule of constitutional law, but declining to discuss whether "it should be retroactively applied under Teague...."); *Pittman*, 120 F.Supp.2d at 1267–1268 (applying *Teague* as a bar to retroactive application of *Apprendi* in 28 U.S.C. § 2255 motion filed after the effective date of the AEDPA); *see also* Kent S. Scheidegger, "Habeas Corpus, Relitigation, and the Legislative Power," 98 Colum.L.Rev. 888, 960 n. 500 (1998) ("The total thrust of the [AEDPA] is toward retraction of the remedy. In addition, the new statute expressly refers to new rules made retroactive on collateral review, ..., a clear indication that the *Teague* exceptions survive."); Evan Tsen Lee, "Section 2254(d) of the New Habeas Statute: An (Opinionated) User's Manual," 51 Vand.L.Rev. 103, 137 n. 64 (1998) ("There are several portions of the statute that conditionally permit petitioners to rely on new rules of criminal procedure, thus assuming the existence of exceptions to *Teague*," citing 28 U.S.C. § 2244(b)(2)(A) (successive petitions); 28 U.S.C. § 2244(d)(1)(C) (statute of limitation); 28 U.S.C. § 2254(e)(2)(A)(i) (evidentiary hearing)); Sharad Sushil Khandelwal, "The Path to Habeas Corpus Narrows: Interpreting 28 U.S.C.

upon the quantity of drugs involved in the criminal offense. As was the common practice in district courts prior to *Apprendi*, the issue of drug quantity was not submitted to the jury, but was determined by a preponderance of the evidence by the district court. *See West v. United States*, 123 F.Supp.2d 845 (D.Md.2000). As the district court in *Pittman* noted after concluding that the rule announced in *Apprendi* did not implicate fundamental fairness,

> I further note that any other conclusion could well lead to overwhelming and disastrous results given that every court in every jurisdiction in the country has treated drug quantity as a sentencing factor for the judge to determine for well over ten years.... Requiring retroactive application of *Apprendi* to every federal and state sentence imposed under such a bifurcated fact-finding system would necessitate a review of thousands of cases when actual innocence of the defendant of the charge and sentence is not in doubt.

*Pittman*, 120 F.Supp.2d at 1270. Arguably, the result of applying *Apprendi* retroactively would not be as "disastrous" as the *Pittman* court feared. First of all, the state of California already requires a jury trial on sentence enhancements and, therefore, violations should be few. Moreover, *Apprendi* violations in state sentence on enhancements could be cured simply by striking the sentence enhancement (which typically represent a small portion of the total sentence) or by reducing the overall sentence to a level within the statutory maximum. *See United States v. Garcia–Guizar*, 227 F.3d 1125, 1129 (9th Cir.2000) (holding that although the district court's finding of drug quantity increased the prescribed statutory maximum penalty to which the defendant was exposed in violation of *Apprendi*, relief was not warranted because the defendant actually received a sentence below the statutory maximum). Furthermore, as an Illinois Court of Appeal explained,

> We understand the implications of extending *Apprendi* to collateral review. But we do what we believe the law requires. Our constitutional history teaches us we best survive when we hew to the line drawn by the rule of law. Because, under *Teague*, we conclude *Apprendi* implicates procedures implicit in the concept of ordered liberty, we find *Apprendi* applies to a timely-filed post-conviction petition.

*Beachem*, 2000 WL 180041.

§ 2254(d)(1)," 96 Mich.L.Rev. 434 (1997) (opining that the "clearly established" phrase codifies the entire *Teague* doctrine, including the exceptions, because (1) in part of the AEDPA, Congress instructed federal courts to hold an evidentiary hearing if the petitioner's claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C.A. § 2254(e)(2)(A)(i); and (2) the *Teague* exceptions have "roots in due process concerns," so that eliminating them might raise constitutional objections).

■■■ There is some question, however, whether the retroactivity determination must be made by the Supreme Court or whether it may be made by lower federal courts. While the Supreme Court has not addressed the precise issue, the Ninth Circuit's recent decision in *Jones* assumes that lower courts retain the power to apply *Teague* and its exceptions to cases before them. *Jones*, 231 F.3d at 1236–1238 (applying *Teague* to preclude relief in post-AEDPA case).

The Third Circuit's decision in *West v. Vaughn*, 204 F.3d 53, 61 (3rd Cir.2000) provides persuasive reasoning supporting the Ninth Circuit's implicit conclusion that lower federal courts faced with post-AEDPA habeas petitions must still consider the non-retroactivity principle announced in *Teague* as well as its exceptions. In *West*, the petitioner sought the benefit of the ruling in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), in which the Supreme Court held that criminal convictions based upon improper jury instruction on reasonable doubt violate the Due Process Clause. *West*, 204 F.3d at 55. The petition, however, was the second one filed by the petitioner, the first having been filed before the *Cage* ruling was issued. *West*, 204 F.3d at 55. As a result, it was subject to

the AEDPA's provision prohibiting successive petitions unless the claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court...." *See* 28 U.S.C. § 2244(b)(2)(A). Third Circuit interpreted section 2244(b)(2)(A), holding that the test did not restrict retroactive rules to those "held retroactive" or "applied retroactively" by the Supreme Court. *West*, 204 F.3d at 55, 58. Instead, the court explained that

> [a]t the time Congress enacted the AEDPA, prevailing Supreme Court precedent "made retroactive" on habeas review new rules that implicated the fundamental fairness of a criminal proceeding and related to the accuracy of the underlying conviction, *see, e.g., Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334, ..., and we assume Congress to have been aware of this practice.

*West*, 204 F.3d at 55. The court went on to explain that the Supreme Court's declaration in *Sullivan*, 508 U.S. at 280–281, 113 S.Ct. 2078, that a *Cage* error amounts to a structural defect indicates that "the *Cage* rule satisfies these fundamental fairness and accuracy requirements." *West*, 204 F.3d at 55.

Courts should assume, as the Third Circuit did, that at the time Congress passed the AEDPA, it was aware of then-current practices in the courts regarding retroactivity. *See Cannon v. University of Chicago*, 441 U.S. 677, 696–697, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *West*, 204 F.3d at 59–62. Because Congress did not explicitly alter this mechanism, it is fair to conclude that Congress intended the *Teague* analysis, including application of the two exceptions to *Teague*, to continue after enactment of the AEDPA. *West*, 204 F.3d at 62. Under this analysis, when it is clear from Supreme Court precedent that a new

constitutional rule falls within a *Teague* exception—most notably, when the rule is clearly a watershed rule implicating the fundamental fairness and accuracy of the proceeding—the new rule may be retroactively applied by a lower federal court in a post-AEDPA petition. *West*, 204 F.3d at 61; *see also Jones*, 231 F.3d at 1236–1237 (performing *Teague* analysis on post-AEDPA § 2254 petition); *Darity v. U.S.*, 124 F.Supp.2d 355 (W.D.N.C.2000) (performing *Teague* analysis on post-AEDPA § 2255 motion); *Ware*, 124 F.Supp.2d 590 (same); *Pittman*, 120 F.Supp.2d at 1267–1269 (same); *Murphy*, 109 F.Supp.2d at 1063–1064 (same); *but see In re Smith*, 142 F.3d 832, 835–836 (5th Cir.1998) (holding that retroactive application of a new rule of constitutional law must be declared by the Supreme Court itself for that rule to justify a second or successive collateral attack on a conviction); *Rodriguez v. Superintendent, Bay State Correctional Ctr.*, 139 F.3d 270 (1st Cir.1998) (same); *Bennett v. United States*, 119 F.3d 470 (7th Cir.1997) (same).[16]

Practical considerations also weigh in favor of lower courts continuing to make retroactivity determinations. As the court noted in *West*, often the clarity of the fundamental nature of a new constitutional rule announced by the Supreme Court "will obviate the need for the Supreme Court to make a future, more explicit, pronouncement on whether [the new rule] should be applied retroactively." *West*, 204 F.3d at 62. Moreover, prior to the AEDPA, the Supreme Court had no reason to be explicit in its pronouncements on retroactivity. *See West*, 204 F.3d at 62. To wait for the Supreme Court to grant certiorari in order to declare a rule retroactively applicable on collateral review would preclude habeas relief for petitioners with clearly meritorious claims.[17]

For the foregoing reasons, absent a clear expression of Congressional intent to withdraw the retroactivity determination from the lower federal courts, it is better that the burden not be shouldered solely by the Supreme Court, but shared by the lower federal courts, who have been entrusted by the Supreme Court with making similar determinations since *Teague* was announced. *See West*, 204 F.3d at 62; *see also Jones*, 231 F.3d at 1236–1238; *but see Williams v. Cain*, 229 F.3d 468, 474 (5th Cir.2000) (concluding that a lower fed-

**16.** The cases in which a *Teague* analysis was performed with respect to an initial petition do not discuss the continued authority of lower federal courts to declare new rules retroactive after the enactment of the AEDPA. Those cases simply assume that they retain that authority. *See Jones*, 231 F.3d at 1236–1237. The cases which do directly address the issue, including *West*, involve the interpretation of a provision of the AEDPA different than the one involved in this case. That is, those cases discuss when a claim falls within the exception to the AEDPA's prohibition against successive petitions—namely, when the claim is based upon a new rule "made retroactive to cases on collateral review by the Supreme Court." *See* 28 U.S.C. § 2244(b)(2)(A). The conclusion of many of the circuits that section 2244(b)(2)(A) requires an explicit announcement by the Supreme Court before a successive petition may be filed is inapposite to determining whether *Teague* is applicable to federal review of the merits of a first petition. Nevertheless, as discussed, the Court relies on *West* to the extent that some of the reasoning and policy arguments in the opinion are relevant and persuasive to thinking about how *Teague* fits into the AEDPA's standard of review.

**17.** From the perspective of lower federal courts, it would be preferable if the Supreme Court made clear at the time it announces a new rule whether the rule is retroactively applicable on collateral review. In the absence of such an express declaration, however, lower federal courts must perform the *Teague* analysis independently. Of course, such lower court decisions regarding retroactivity are subject to review by the Supreme Court.

eral court's holding that a new constitutional rule applies retroactively is insufficient to make it retroactive under the AEDPA, and holding that a post-AEDPA petitioner is entitled to the benefit of a new constitutional rule only if the Supreme Court has declared such rule retroactively applicable); *Muhleisen v. Ieyoub,* 168 F.3d 840, 844 n. 2 (5th Cir.) (same), *cert. denied,* 528 U.S. 828, 120 S.Ct. 81, 145 L.Ed.2d 69 (1999).

**Application of *Apprendi* to petitioner's claim**

■ Application of *Apprendi* to petitioner's claim entitles him to relief because the wholesale failure to instruct the jury as to any of the elements required to make a finding on the personal use of a firearm sentence enhancement allegation violated petitioner's constitutional right to a jury trial and resulted in structural error. *See Sullivan,* 508 U.S. at 277, 113 S.Ct. 2078 (holding that a constitutionally defective reasonable doubt instruction is structural error); *Harmon v. Marshall,* 69 F.3d 963, 965 (9th Cir.1995) (per curiam) (holding that failure to give the jury any definition of an offense is structural error).[18] The conclusion that the error in this case was structural and, therefore, not subject to harmless error review, is confirmed by the Supreme Court's decision in *Sullivan,* by the Ninth Circuit's decision in *Harmon,* and by the California Supreme Court's decision in *People v. Cummings,* 4 Cal.4th 1233, 18 Cal.Rptr.2d 796, 850 P.2d 1 (1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994).

In *Sullivan,* the Supreme Court refined the distinction between trial errors subject to harmless-error review and structural errors requiring automatic invalidation of a conviction. There, the petitioner was charged with and convicted of first-degree murder and sentenced to death. In the jury instructions, the judge gave a definition of "reasonable doubt" that previously had been found unconstitutional. *Sullivan,* 508 U.S. at 277, 113 S.Ct. 2078. The state appellate court held that the erroneous instruction was harmless beyond a reasonable doubt. *Sullivan,* 508 U.S. at 277, 113 S.Ct. 2078. The Supreme Court discussed the interrelatedness of the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment's requirement of a jury verdict. The Supreme Court noted that it "would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine ... whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan,* 508 U.S. at 278, 113 S.Ct. 2078. Because the constitutionally defective jury instruction did not produce such a verdict, the petitioner was denied his right to a jury trial. *Sullivan,* 508 U.S. at 278, 113 S.Ct. 2078.

The Supreme Court went on to explain that the error was not subject to harmless-error review. In particular, the Supreme Court noted that because there had been no valid jury verdict within the meaning of the Sixth Amendment, the question whether the same verdict would have been ren-

---

**18.** The decision in *Neder v. United States,* 527 U.S. 1, 8–13, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that an improper jury instruction on a single element of an offense is subject to harmless error analysis), is not to the contrary. Unlike *Neder,* this case does not involve a misdescription or omission of an element of the personal use of a firearm sentence enhancement. Rather, as discussed, the jury charged with the duty to determine whether petitioner personally used a firearm in the commission of the assault pursuant to section 12022.5 of the California Penal Code was provided *no* jury instruction as to any of the elements that make up the sentence enhancement.

dered absent the constitutional error is "utterly meaningless." *Sullivan,* 508 U.S. at 280, 113 S.Ct. 2078.

> There is no object, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury would surely have found petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt would surely not have been different absent the constitutional error. That is not enough .... The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.

*Sullivan,* 508 U.S. at 280, 113 S.Ct. 2078 (citations omitted).

In *Harmon,* a case similar to this one, the trial court gave no instruction to the jury on any of the elements of two of the charges against the petitioner. *Harmon,* 69 F.3d at 965. The state conceded that the failure to instruct was error, but argued that the error was harmless. *Harmon,* 69 F.3d at 965. The Ninth Circuit disagreed, holding that "the failure to give the jury any definition of an offense at all is such fundamental and basic error that it cannot be harmless" and, therefore, automatic reversal was required. *Harmon,* 69 F.3d at 965. The court discussed *Sullivan,* which held that a constitutionally deficient reasonable doubt instruction deprives the defendant of his basic right to a jury verdict and "vitiates all the jury's findings." *Harmon,* 69 F.3d at 965, quoting *Sullivan,* 508 U.S. at 281, 113 S.Ct. 2078. The court reasoned that the complete failure to instruct a jury with respect to a particular offense was like a constitutionally deficient harmless error instruction because "the entire basis for the jury verdict was tainted; [the court] cannot be sure that the jury made any of the requisite

factual findings." *Harmon,* 69 F.3d at 966. As the Ninth Circuit concluded,

> [w]e find it difficult to imagine a more fundamental or structural defect than allowing the jury to deliberate on and convict [petitioner] of an offense, for which it had no definition.

*Harmon,* 69 F.3d at 966.

Indeed, the California Supreme Court reached a similar conclusion in *Cummings,* a case in which the defendant was charged with numerous counts of robbery. The jury was not instructed with the elements of the crime of robbery. The jury was instructed, however, with the requisite mental state for the crime of attempted robbery (i.e., that "... the crime of attempted robbery ... requires the specific intent to permanently deprive the owner of its property."). *Cummings,* 4 Cal.4th at 1311–1312, 18 Cal.Rptr.2d 796, 850 P.2d 1. The California Supreme Court rejected the state's argument that the instructional error was subject to harmless error review. The court explained that the harmless error rule was not applicable because the instructional error was such that it withdrew from jury consideration "substantially all of the elements of an offense" and "did not require by other instructions that the jury find the existence of the facts necessary to a conclusion that the omitted element had been proved." *Cummings,* 4 Cal.4th at 1315, 18 Cal.Rptr.2d 796, 850 P.2d 1. Thus, the court found that the defendant's convictions for robbery were subject to reversal "regardless of the merits of the People's argument that [the defendant] did not dispute the existence of the predicate facts and that the evidence overwhelmingly established all of the elements of the robbery charges." *Cummings,* 4 Cal.4th at 1314–1315, 18 Cal. Rptr.2d 796, 850 P.2d 1.

In this case, the failure to provide the jury with any explanation of the definition

of the sentence enhancement and the elements that the state was required to prove beyond a reasonable doubt amounted to structural error. Like the juries in *Harmon* and *Cummings*, the jury was, in effect, free to convict petitioner without finding that the state had proved any of the requisite elements of the personal use of a firearm sentence enhancement. Indeed, the trial court's failure to instruct regarding any of the elements of the sentence enhancement, while allowing the jury to render a verdict on that sentence enhancement, sent the jury to its deliberative duties deprived of its essential tool: the law that was to be applied to the facts. The jury, then, was left to speculate or to guess what the prosecutor might be required to prove. Such a wholesale failure is structural error requiring reversal of the finding that petitioner personally used a firearm in commission of the assault within the meaning of section 12022.5 and the five years sentence imposed on the basis of that finding. *See Guam v. Marquez*, 963 F.2d 1311, 1315 (9th Cir.1992) (holding that it was structural error for the trial court to give written instructions to the jury instead of reading the instructions in open court); *People v. Duncan*, 462 Mich. 47, 610 N.W.2d 551, 554–555 (2000) (holding that it is structural error requiring automatic reversal to allow a jury to deliberate on a criminal charge where there is a complete failure to instruct the jury regarding any of the elements necessary to

determine if the prosecution has proven the charge beyond a reasonable doubt).

Finally, the California Court of Appeal's finding that the evidence that petitioner personally used a firearm was "compelling" is immaterial. *See Sullivan*, 508 U.S. at 280, 113 S.Ct. 2078 ("The Sixth Amendment requires more than appellate speculation about a hypothetical jury's actions, or else directed verdicts for the state would be sustainable on appeal; it requires an actual jury finding of guilty."). As the Ninth Circuit explained in *Harmon*, the fact that the evidence establishing guilt was in that case "overwhelming" did not mean that the petitioner was not entitled to relief. "We cannot judge the defendant guilty; that role is reserved for the jury." *Harmon*, 69 F.3d at 966. Thus, the opinion of the state court, and any opinion by this Court, regarding the strength of the evidence as to whether petitioner personally used a firearm in the commission of the assault is immaterial.

A jury of laypersons forced to guess at the law is not ordered liberty, it is chaos. Part of the core concept of a jury trial is that the jurors find the facts and apply to them the law described by the judge in order to reach a verdict. *See Sparf and Hansen v. United States*, 156 U.S. 51, 102–103, 15 S.Ct. 273, 39 L.Ed. 343 (1895).[19] If a jury is given no direction as to the legal elements of a sentence enhancement, the accuracy of a jury determination that a

---

**19.** In *Sparf and Hansen*, the Supreme Court stated:

We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be. Under any other system, the courts, although estab-

lished in order to declare the law, would for every practical purpose be eliminated from our system of government as instrumentalities devised for the protection equally of society and of individuals in their essential rights. When that occurs our government will cease to be a government of laws, and become a government of men. Liberty regulated by law is the underlying principle of our institutions.

*Sparf and Hansen*, 156 U.S. at 102–103, 15 S.Ct. 273.

defendant committed the alleged act is fatally flawed. *See Duncan*, 610 N.W.2d at 554 (stating that the absence of any instructions regarding the elements of the charge improperly "left the jury to guess what the prosecuting attorney might be required to prove.").

For these reasons, petitioner is entitled to relief on this claim. The finding on the sentence enhancement allegation should be reversed and petitioner's sentence should be modified accordingly. Of course, the State of California is free to re-try petitioner on the sentence enhancement allegation, so long it provides petitioner his constitutionally protected right to a jury determination of the allegation, including instructions covering the relevant law.

### 3. Failure to instruct the jury regarding lesser included offenses

Petitioner contends that the trial court erred by failing to instruct the jury on the lesser included offenses of assault and exhibiting a firearm. [Petition at 6–7].

Failure of a state trial court to instruct the jury on lesser included offenses in a non-capital case does not present a federal constitutional question. *Windham v. Merkle*, 163 F.3d 1092, 1105–1106 (9th Cir.1998) (explaining that "[u]nder the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."), citing *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir.1995), *overruled on other grounds, Tolbert v. Page*, 182 F.3d 677 (9th Cir.1999). Thus, this claim is not cognizable on federal habeas review.

### Conclusion

It is recommended that the Court issue an Order (1) adopting this report and recommendation, and (2) directing that judgment be entered (a) granting the petition on the claim challenging petitioner's sentence enhancement based upon personal use of a firearm in the commission of the assault with a firearm offense, vacating the jury's finding on that sentence enhancement, and vacating the sentence imposed as a result of that finding; and (b) denying the petition on the remaining claim.

Jan. 10, 2001.